UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 86-6122-CR-ZLOCH

UNITED STATES OF AMERICA,

       Plaintiff,

-vs-

JAMES NOLAN,

       Defendant.

_____/

## MOTION FOR WRIT OF AUDITA QUERELA

Defendant, **JAMES NOLAN**, through counsel, respectfully files this

Motion for Audita Querela requesting the Court reconsider two findings and

recommendations made at his sentencing: (1) rescind the finding made that

NOLAN should be sentenced as a Special Dangerous Offender pursuant to 18

U.S.C., Section 3575(a)(2) and (3); and (2) rescind the recommendation to the

U.S. Parole Commission that NOLAN should never be paroled.  In support of that

relief, the Defendant would state:

### SENTENCING–10/23/89

1.  On October 23, 1989, NOLAN appeared before this Court to be

sentenced upon a finding of guilt by a jury for having violated the Racketeering

Influenced and Corrupt Organizations Act (hereinafter "RICO"), in violation of

18 U.S.C., Section 1962(c ) (Count I), and conspiring to commit RICO, in

violation of 18 U.S.C., Section 1962(d) (Count II).  Before the Court was the fresh

memory of the trial which had detailed dozens of crimes which NOLAN had

committed through his association with the Outlaws Motorcycle Club, particularly

the South Florida Chapter from 1969 to mid-1981.  This was in every sense of the

word, an historical conspiracy covering the time-period of his mid-20's to 30's.

2.   The NOLAN who was then before the Court had been in jail from close

to when he had committed the last racketeering act listed in the Indictment,

although it was not for this Indictment.  On July 11, 1981, when NOLAN was

residing in Tucson, Arizona, he was arrested on murder charges arising from a

fatal shooting at a biker bar called the Bashful Bandit.  Chronicled by the wiretap

on NOLAN's home telephone, the last predicate acts listed on the Indictment

overlapped with this incarceration.   Following that, NOLAN was indicted in

Federal Court for possessing a firearm while being a convicted felon, the incident

of possession having arisen out of the Bashful Bandit shooting.  A few weeks

later, NOLAN was able to post bond for both offenses.  He remained briefly at

liberty until Iris Geoghagen, a former "old lady" who had previously gone to the

police to report NOLAN's criminal activity, swore out another warrant for his

arrest for breaking her jaw back in March, 1981.  NOLAN was arrested on

2

November 14, 1981, and has been in jail every day of his life, over 28 years, since then.

3.  Before the Court stood a man who had begun to come to terms with the crimes he had committed.  The Court heard extensive testimony from witnesses who attested to the sincerity of NOLAN's conversion to Christianity after his incarceration in the early 1980's.

4.  The Government had filed before the trial a Notice of Intention to Seek an Enhancement for NOLAN under the provisions of 18 U.S.C., Section 3575, since repealed, which requested his designation as a Special Dangerous Offender. That filing had been made under seal.  The law provided that the Notice be under seal to prevent the Court from being biased against a defendant so designated during trial.  In a reflection of NOLAN's immaturity at the time, he wanted his shock, dismay and objection to such a designation brought to the Court's attention immediately, and he waived the confidentiality provisions of the statute.

5.  Section 3575 provided for the Court to hold a hearing during the sentencing hearing in order to determine whether there was evidence of NOLAN's dangerousness to society that would warrant increasing the maximum penalty to 25 years to each count if conviction.  In NOLAN's case, the two racketeering

counts for which he had been convicted each carried a 20-year maximum prison term without the enhancement.

6. As he stood before the Court, NOLAN explained that he had already served part of his sentence because of convictions in the Arizona Courts for conduct which was also part of the case before the Court. He had been convicted of the aggravated battery on Iris Geoghagen, and sentenced to prison. He had been indicted under Arizona's RICO Statute for the prostitution crimes he committed in Arizona, which was a feature at his trial before the Court. He had accepted a guilty plea to a lesser offense of receiving the proceeds of a prostitute, who testified at trial. Although he was eventually acquitted in the Bashful Bandit shooting under a self-defense theory, Iris Geoghagen testified against him in the Federal felon in possession trial that she acted as his "holster", which she characterized as one of her duties as an Outlaw "old lady". He had been convicted on that charge, and sentenced to nine years in Federal prison. All of these sentences ended in November, 1987, which was the beginning of the trial before this Court. NOLAN was aware that a co-defendant, James Starrett a/k/a "Blue" had been given "credit" for having served time in State prison for a crime which was also included in his Indictment as a predicate act. NOLAN requested this

Court recognize that he had already started serving time for this crime, and adjust his sentence accordingly.

7.  After hearing argument, this Court determined that NOLAN fit the criteria of a Special Dangerous Offender.  This increased the maximum term of imprisonment he was facing to 50 years.

8.  The Court rejected the notion that NOLAN should receive any "credit" for the time he had already served arising from the prior Arizona conviction.  The Government was apparently persuasive in pointing out that the allegations of narcotics activity in Arizona were not covered by his guilty plea receiving the earnings of a prostitute.

9.  The Court rejected NOLAN's conversion to Christianity as a mitigating factor stating:

> The Court acknowledges the testimony presented by Mr. Nolan here today with respect to his conversion to Christianity, but finds that the greater weight of the evidence, the preponderance of the evidence, demonstrates a great likelihood that Mr. Nolan will continue to engage in criminal conduct despite his involvement in Christianity.

(Tr. of 10/23/89 at 138).

10.  The Court pronounced NOLAN's sentence at the maximum allowable under the law: 50 years.

11.  The Court further made a recommendation that NOLAN should never be paroled (Tr. of 10/23/89 at 139-140).

NOLAN'S PAROLE DILEMMA

12.  NOLAN comes before the Court with a 28-year long track record in Federal prison for this case and the felon in possession case displaying good institutional adjustment, and an ability and willingness to make a positive contribution to life within whatever prison he happened to be housed in NOLAN has tried to extend himself both to the institution and his fellow inmates in order to help make peoples' lives better.  He has tried to make up for all the hurt he has caused.  When NOLAN recontacted counsel, who had represented him under the Criminal Justice Act from September, 1986, until the Petition for Writ of Certiorari to the U.S. Supreme Court was denied in 1996, he wanted a procedural vehicle to bring proof  of his change to the Court in an effort to assist him in getting parole.  NOLAN understands that he is not entitled to be released on parole.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979).   He does believe that his showing before the U.S. Parole Commission in 1997 was compelling enough to warrant a grant of  parole, but his designation as a Special Dangerous Offender and this Court's recommendation that he never be paroled have effectively negated his presentation and justified

denying him parole.  NOLAN is hoping that after the Court has reviewed the course he has taken his life after his sentencing, and considered the letters of recommendation and other documents contained in the Appendix, the Court might consider issuing an Order which would, in effect, give permission to the Parole Commission to consider his application for parole on its merits.  Those merits would include consideration of his age and medical condition, a demonstrative history of non-violence while incarcerated, his stewardship to others, the promise of employment, his contribution to the music program in prison, his Christian lifestyle,  and the support of his wife, Helen Nolan, who has stood by him for all of these years.  NOLAN recognizes that the Parole Commission is obligated to consider, and did consider in his case, the nature of his criminal conduct and criminal history.  NOLAN never wanted the Court to think that he has minimized his crime, but he is a much older (66 years old) and different man now than he was when he was sentenced, and certainly far different from the young man who committed the crimes of conviction so many years ago.

13.  The Parole Commission published Guidelines which are applicable in all parole-eligible cases.  28 C.F.R. Section 2.20.  These are cases which preceded the promulgation of the Federal Sentencing Guidelines in 1997.  Parole was never considered a reduction or mitigation of sentence.  It was merely the recognition

that upon a proper showing, an inmate could earn the privilege of living under close supervision in the community for the remainder of his sentence. Any violation of parole would result in the inmate being returned to prison to serve out the remainder of his sentence in close confinement.

14. The Parole Commission considers an inmate's case with reference to Guidelines. "These Guidelines indicate the customary range of time to be served before release for various combinations of offense (severity) and offender (parole prognosis) characteristics." 28 C.F.R. Section 2.20(b). Every inmate is assigned a severity rating from a Category One to Eight in an ascending order of seriousness. This would be contrasted with a salient factor score, which reflects the inmate's personal history, including his criminal past. The salient factor score would be a number between zero and 10 with 10 being the best parole prognosis, and zero being the worst. Due to the seriousness of the crimes of conviction, which earned NOLAN a severity rating of Category Eight, and his criminal past preceding his conviction in this case, which earned him a salient factor score of 3, NOLAN'S expectation of parole under the Guidelines would not be realized until after he had served at least 180 months in prison.

15. Pursuant to 18 U.S.C., Section 4205(a), the Parole Commission would be empowered to release an inmate on parole only after he has served at least one-

third of his sentence.  In NOLAN's case, that would be over 16 years.  For NOLAN, his one-third eligibility is equivalent to his Guideline range.  NOLAN has served over 22 years on the sentence imposed by this Court to date.

16.  NOLAN was designated by the Parole Commission as "original jurisdiction".  28 C.F.R. Section 2.17.  This occurred because of the length of sentence imposed and/or the notoriety of the inmate.  A review of an "original jurisdiction" parole application bypasses the Regional Commissioners, and are referred directly to the Parole Commission sitting in Washington, D.C.  This designation alone brings NOLAN's case under greater scrutiny than the typical parole candidate.

17.  In 1997, NOLAN was able to make an application for parole.  A Hearing Officer was tasked with reviewing the Pre-Sentence Investigation Report, and any other reports and correspondence from the U.S. Attorney's Office or Federal law enforcement agencies as well as the evidence presented by NOLAN.  The Hearing Officer gave his assessment of NOLAN's crimes, and agreed with the Court that they were very serious.  Any mitigation of them presented by NOLAN was discounted in part due to this Court's designation of NOLAN as a Special Dangerous Offender and its recommendation that he never be paroled.  As the Hearing Officer stated:

> As part of this recommendation, I am considering what the Federal Judge who sentenced you had said and that is that you should never be paroled, that's paraphrasing what was said.

Parole Hearing of 10/8/97, Disc 2 at 22:18.

The recommendation was to deny parole release and defer any further parole consideration for 15 years. The next time NOLAN comes up for parole would be in 2012. His two-thirds release is scheduled for 2016, although whether he will be paroled even at that time may be problematic considering the no parole recommendation.

    18. In the meantime, NOLAN's no parole status was reviewed biannually. In these biannual reviews, the Hearing Officer does not have the power to review the previous finding or recommend a new parole hearing unless there were changed circumstances as described in 28 C.F.R. Section 2.28. After 1997, NOLAN appeared for a biannual review in 1999, 2001, 2003, 2006, 2008 and, most recently, earlier in 2010. NOLAN fears that when he comes up for full parole review in 2012, this Court's recommendation that he never be paroled will again be followed. By this Motion, NOLAN seeks to persuade the Court that it should withdraw its recommendation in order to give him a chance at parole.

19. NOLAN contends that this Court can modify or abolish that portion of the Judgment and Commitment Order which contains the recommendation that he never be paroled at any time. The relief sought is not the same as a request to amend a Judgment and Commitment Order to provide for the possibility of earlier parole. Title 18, U.S.C., Section 4205(b)(2)(1), for instance, permits a district court to establish a minimum amount of time a defendant must serve of a sentence before becoming eligible for parole. Section 4205(b)(2) permits a district court to enter an Order allowing a defendant to be eligible for parole whenever the Parole Commission desires. Amending a Judgment and Commitment Order to include these provisions of law have been held to constitute a reduction of sentence, and are considered governed by Rule 35 of the Federal Rules of Criminal Procedure. In re United States, 588 F.2d 56, 60 (4th Cir. 1078). The recommendation of no parole made by the Court, however, had no affect on NOLAN's eligibility for parole, only the likelihood that it would be granted, or more accurately, not granted. When a Court provides relief under Section 4205, it issues an Order binding upon the Parole Commission. NOLAN is not asking the Court to provide relief under Section 4205. The Court's recommendation that NOLAN should never be paroled was just that, a recommendation and not an Order. This Court

may lack jurisdiction to enter an Order, but not to change a recommendation previously made if it chose to.  Rescinding the recommendation would not compel the Parole Commission to do anything.  It would merely give the Parole Commission one less factor to consider when deciding whether to grant parole. In the accompanying Memorandum of Law, NOLAN will seek to persuade this Court to consider the application of the common-law Writ of Audita Querela to this request.  The Writ of Audita Querela is also being invoked to persuade the Court to reconsider its designation of NOLAN as a Special Dangerous Offender. NOLAN contends that even if the Court rejected his argument that a Writ of Audita Querela would lie to reduce his sentence by vacating his designation as a Special Dangerous Offender, it could still rescind or modify its recommendation that he never be paroled.

### NOLAN'S REHABILITATION–GROWING OUT OF THE PAST

20.  NOLAN started his rehabilitation long before the trial that brought him before this Court for sentencing.  He presented evidence of his conversion to Christianity, and presented witnesses to attest to his sincerity as a Christian at his Sentencing Hearing.  The Court was understandably skeptical.  The Court did not

believe that NOLAN's decision to walk with Christ might mitigate his future dangerousness as established by the crimes he had committed in the past.

21.   But NOLAN's path after his sentencing was consistent with his desire to rehabilitate himself with the hope of someday joining his family to live the rest of his life in peace as a respected member of the community.  The proof of his rehabilitation includes, but is in no way limited to, his expression of Christian faith.  He has been an active participant in a positive sense in whatever prison he has been designated to, and has impressed hundreds of people with his kindness, compassion, talent and leadership.  Attached as an Appendix is a collection of Certifications, official Bureau of Prisons documents, and testimonials to NOLAN. They come from family members, friends on the outside, people on the outside who have had the opportunity to observe him, and fellow inmates.  What follows is a guide to this Appendix.

22.   First and foremost is the support of his wife, Helen Nolan.  She has followed NOLAN around relocating to every community where he has been incarcerated.  She has shown remarkable support and displayed great faith in her husband.  Despite knowledge of his crimes, she has offered to take him into her home and assist the Court and the Parole Commission with his rehabilitation.  She

has not only visited with him to keep their family alive, but she has been a co-participant in many of the activities reflected elsewhere in the Appendix.  Her statement to the Court is Exhibit "A" of the Appendix.

23.  NOLAN always played the guitar.  From the beginning of his incarceration, he continued to play the guitar in various prison bands.  But NOLAN went beyond participation in the various prison music programs.  He began to teach guitar to other inmates.  His availability, willingness, even enthusiasm, for bringing the gift of music to others has won him recognition from the Bureau of Prisons.  The Bureau of Prisons has acknowledged that NOLAN's music lessons have saved thousands of dollars in what would otherwise be the contracting with music professionals from the outside to teach the classes.  Consequently, NOLAN has received several awards of Special Good Time from the Bureau of Prisons.  The most recent was awarded on February 16, 2010, and is attached as Exhibit "B" of the Appendix.  He has received a total of 1,261 days in Extra Good Time, and Extra Good Time won some awards and adjustments.  Other rewards were made on May 11, 2009, Exhibit "C",  February 25, 2008, Exhibit "D", as well as 1994, Exhibit "E".  NOLAN was able to make the transition from musician to music teacher after he completed a seminar at

14

U.S.P.–Terre Haute in 1994.  See, Exhibit "F".  The following year, NOLAN

received a Certificate of  Appreciation for his services rendered to the Musicians

Club at Terre Haute.  See, Exhibit "G".

24.  Testimonials from fellow inmates discussing the positive impact

NOLAN's music teaching has had on their lives and their family relations are

contained in Exhibit "H".  When reviewing these testimonials, it cannot be denied

that they are more than just expressions of gratitude, but are factually based and

sincere.  Many of these inmates were truly inspired by the life-changing effect

which music can make on returning convicted criminals to society and NOLAN

was a facilitator of that process.

25.  NOLAN received training and became an inmate barber in 1996.

Later that year, another Extra Good Time Recommendation was submitted for his

contribution as an inmate barber, which are attached as Exhibit "I".

26.  NOLAN has earned praise and written recommendations from prison

staff.  These recommendations should be read because they provide strong

evidence not only of NOLAN's cooperation with the prison staff, but his message

of atonement and forgiveness for his own crimes that he uses to help others accept

responsibility for theirs.  Although it may be considered a small matter, NOLAN

enthusiastically volunteered to play Santa Claus in the visiting room during Christmas, 1996.  See, Exhibit "J" attached.  Exhibit "K" is a Memorandum from a Recreational Specialist of U.S.P.–Allenwood recounting how NOLAN volunteered to accept roommates in a single cell, effectively functioned as the band leader of an interracial band, and fully discussed with other inmates how his criminal activity has harmed society.  The officer states in conclusion, "Out of the thousands of inmates I have come into contact with, inmate Nolan is the only inmate I would consider writing a memorandum of this nature for."  Exhibit "L" is a Memorandum from the Senior Officer at the same institution corroborating the previous Memorandum.  There is mention of his Christianity and the impact on his observed behavior in these letters, but these references appear to describe a man whose faith has been fully integrated in his life.  Without wearing his Christian faith on his sleeve, NOLAN had continued his actions in prison ministry.

27.  Helen Nolan appears in a crucial supporting role in NOLAN's excellent institutional adjustment and service to the Bureau of Prisons.  As indicated in Exhibit "L", she has over the years relocated herself to the community near where NOLAN has been incarcerated.  She visits with him frequently and the Senior Officer observed a devoted, stable and strong family unit.  The Senior Officer summed up:

16

> Through the course of my experiences with inmate Nolan, I
> honestly believe that there has been a change over the course
> of his confinement.  I feel that if inmate Nolan were to be
> released back into society, he would lead a productive and
> prosperous life through the guidance of his family and the
> church.  It is my professional and personal belief that inmate
> Nolan no longer poses a threat to society, and that his release
> from confinement would not be a hindrance to a local community.

28.  As far back as 1995, NOLAN and his wife participated in Citizens

United for Rehabilitation of Errants.  A brochure from that organization is

attached as Exhibit "M".  Throughout these long years, NOLAN has made every

effort to come to gripes with, understand and feel remorse for the crimes he has

committed and the damage he caused his victims and society.

29.  NOLAN has made every effort to fulfill the statement he made to the

Court at sentencing regarding his Christian faith.  In Exhibit "N" are contained

testimonials corroborating not only his continued belief and worship of Christ and

his works, but the positive impression he has left with those for whom he has

associated in that mission.  Reverend Frank Cantania, the Executive Director of

Brothers' Keeper, has included a letter attesting to the changes he has observed in

NOLAN in over 40 years of contact.  He indicates that "Jim can be used as I have

to bring Hope to others and I would welcome the opportunity to have Jim work alongside me and others who have come from my past to a better tomorrow." Another Minister, Charles Austin, noted that "his lengthy sentence and the stigma the word Christian implies to other inmates, I was surprised at his strong stance in his beliefs and his dedication to his constant Bible studies." Mr. Austin goes on to claim that he "[n]ot only do I truly believe in his acceptance of Jesus Christ as his Lord and Savior. I believe he can touch and change lives as a free man, for a better society." Billy Migares, who oversees a Ministry of Calvary Chapel in Fort Lauderdale, has also spent considerable time with NOLAN. His words bear emphasis:

> I believe Mr. Nolan at the time of his incarceration was surely deserving of a prison term to remove him from society and provide him with an opportunity to re-evaluate his life up to that point as well as relating to his future. Now it has been 29 years that Mr. Nolan has been incarcerated. It is my honest belief that Mr. Nolan has paid for his crimes these last 29 years and should be given a second chance to live his life with his wife and family by the grace and mercy of the courts. I am offering my help to him that coming alongside and helping with spiritual support as well as way the courts might fit as assurance for his positive assimilation into our society. Mr. Nolan I am sure if given the chance would become a contributing member of society instead of a drain on the already overburdened penal system.

A fellow inmate, Savatore Leo, has written on the positive impact NOLAN had when his wife was dying of cancer while he was incarcerated.  Lois Shaffer wrote how she provided Bibles to NOLAN and his wife to hand out to other prisoners. Donnie Nitter, writes that NOLAN had "[f]or 28 years now he has been a light to many lost souls, like mine.  To look at his record, he should have been shot or hung a long time ago, but when God looked at Jim, he saw the good in him." Finally,  Debora Diaz writes about NOLAN's assistance in the events surrounding her father's death.

30.  Some of NOLAN's relatives have also come forward to explain their impressions of NOLAN's changes.  The letters have been gathered and compiled in Exhibit "O".  Janet and Daryl Roeder, who had resided back in Tucson, Arizona in 1980, have written on his behalf.  Another niece, Kathleen Lyon, a retired sergeant in the U.S. Army, who served two tours in Iraq, can give the Court insight into his current family relations.

31.  NOLAN has several prospects for employment if he should be released on parole.  Three such offers are complied in Exhibit "P".

32.  NOLAN himself has not written a letter to express his feelings preferring to let others speak on his behalf.  This form of humility speaks volumes on how he has developed true character and integrity.

33.  NOLAN does not need to speak in order to show the Court that he is an older man whose release would endanger noone.  He has been incapacitated by his lengthy prison sentence.  Counsel has reviewed some of NOLAN's medical records, and sees that he has been diagnosed with Degenerative Disc disease which has been verified by MRI's of his right hip, lumbar spine and pelvis taken February 19, 2010.  As a consequence of this condition, NOLAN has been walking with the assistance of a cane.  There was nothing acute revealed in the MRI's, but given NOLAN's age (66 years old), this medical condition will continue to worsen and become more debilitating over time.  A man with these physical infirmities does not pose a threat to society.  The recommendation made by this Court in 1989 should no longer stand in the way of NOLAN's consideration for parole.

<u>MEMORANDUM OF LAW</u>

A.   <u>Writ of Audita Querela</u>

This Petition for Writ of Audita Querela is being filed pursuant to the All Writs Act, 28 U.S.C., Section 1651.  "The Supreme Court and all courts established by act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C., Section 1651.  "Audita Querela", literally 'the complaint having been heard,' is a common-law writ used to attack a judgment that was correct when rendered, but that later became incorrect because of circumstances that arose after the judgment was issued."  <u>Carrington v. United States</u>, 503 F.3d 888, 890, n. 2 (9th Cir. 2007).

The Writ of Audita Querela "was an ancient writ used to attack the enforcement of a judgment after it was rendered."  <u>United States v. Holt</u>, 417 F.3d 1172, 1174 (11th Cir. 2005), quoting Black's Law Dictionary 126 (7th ed. 1999). The common-law writ was typically employed by a judgment debtor in a civil case against the execution of a judgment because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution.  <u>Id</u>..  <u>See</u>

21

also, United States v. Valdez-Pacheto, 237 F.3d 1077, 1078 (9th Cir. 2001).  The

Writ of Audita Querela was abolished in the civil context by the Federal Rules of

Civil Procedure.  Fed.R.Civ.P. 60(b).  Questions have been raised concerning the

extent to which the Writ of Audita Querela or any other common-law writ would

continue to apply in the criminal context.

The Eleventh Circuit first addressed this issue in Gonzalez v. Secretary for

Dept. of Corrections, 366 F.3d 1253 (11th Cir. 2004).  In Gonzalez, the Court

analyzed the remedies under the common-law for obtaining relief from civil

judgments.  The promulgation of Rule 60(b) was intended not so much to

eliminate the substantive bases for seeking relief, but to eliminate their complex

procedural requirements.  Id., at 1290-1 (the drafters of modern Rule 60(b) were

unconcerned with "the substantive law as to the grounds for vacating judgments.")

The Court went on to define the parameters of Rule 60(b)'s provisions to the

review of orders entered in habeas corpus proceedings.

In Holt, the Eleventh Circuit specifically addressed the applicability of the

Writ of Audita Querela to criminal cases.  Following the U.S. Supreme Court's

decision in United States v. Morgan, 336 U.S. 502 (1954), the Court recognized

that 28 U.S.C., Section 2255 did not provide the exclusive remedy for a prisoner to

obtain post-conviction habeas corpus relief in all circumstances.  The Federal

Courts could properly "fill the interstices of the federal post-conviction remedial framework through remedies available at common-law."  Holt, 417 F.3d at 1174-5.  The Court held that the ancient writs, such as audita querela, would be available to fill in the gaps where relief would not be available under Section 2255.  Id., at 1175.  See also, United States v. Sperling, 2010 WL 610464 (2nd Cir. Fed. 23, 2010); United States v. Valdez-Pacheto, 237 F.3d at 1079.

More recently, the Eleventh Circuit has rejected claims from prisoners seeking to use a writ of audita querela to contest the validity of a criminal judgment based upon constitutional grounds not determined to be applied retroactively in Section 2255 proceedings.  See, e.g., United States v. Chavarry, 2010 WL 1677147 (11th Cir. April 27, 2010); United States v. Arevalo, 2010 WL 935648 (11th Cir. March 17, 2010); Walker v. United States, 2010 WL 618106 (11th Cir. Feb. 23, 2010); United States v. Davis, 2009 WL 3465917 (11th Cir. Oct. 29, 2009).  The Court in these cases, as in Holt, construed the motion for writ of audita querela before it as a successive petition under Section 2255, and denied relief on that basis.  By so holding, the Court was finding that a writ of audita querela would not lie if relief was obtainable under Section 2255.  The relief NOLAN is seeking herein would not be obtainable by filing a Section 2255 Petition.

On January 18, 2008, U.S. District Judge Thomas S. Zilly granted a Petition for Writ of Audita Querela filed by an incarcerated inmate named Donald Craig Kessack in the Western District of Washington in Seattle.  Kessack v. United States, 2008 WL 189679 (W.D. Wash. January 18, 2008).  Kessack had been sentenced at a time when the Federal Sentencing Guidelines were mandatory.  At the time of his conviction, appeal, and availability of a remedy under Section 2255, he was precluded from attacking the constitutionality of the Federal Sentencing Guidelines.  United States v. Booker, 543 U.S. 220 (2005), which declared the Federal Sentencing Guidelines unconstitutional and made them advisory could not be applied retroactively in a Section 2255 proceeding.  Nonetheless, the District Court addressed equal protection concerns apparent from comparing Kessack's sentence to those imposed on his co-defendants, and granted him relief.

The District Court in Kessack did not allow the Writ of Audita Querela to be used to circumvent Section 2255.  It based its decision on equal protection grounds.  In Massey v. United States, 581 F.3d 172 (3d Cir. 2009), the Court discussed Kessack and whether its holding that a Writ of Audita Querela could "fill a gap" in Section 2255 in a case where Booker would not apply retroactively on collateral review.  While specifically rejecting that suggestion, the Court

24

discussed the equal protection grounds justifying the <u>Kessack</u> Court's decision, and did not reject <u>Kessack</u>'s result.  <u>Id</u>., at 174, n. 2.  <u>See also</u>, <u>United States v. Zemba</u>, 336 Fed.Appx. 756,*2, n. 2 (3d Cir. 2009).  NOLAN is not seeking to circumvent Section 2255, but is requesting relief not obtainable in a Section 2255 proceeding.

NOLAN contends that the remedy of Audita Querela can apply to a reconsideration of this Court's 1989 finding that NOLAN's risk of future dangerousness justified applying the Special Dangerous Offender sentencing enhancement as well as the Court's recommendation against parole.  Each ground for relief will be considered separately.  As the statute setting forth the procedure and criteria for sentencing as a Special Dangerous Offender was repealed when the Federal Sentencing Guidelines took effect, a review of its provisions would be in order.

B.  <u>Special Dangerous Offender</u>

NOLAN is seeking relief under Audita Querela on both issues, but recognizes that the Court might agree with him on one, and disagree on the other. A Special Offender is defined as a defendant charged with a felony

       1.  Who has previously been convicted;

       2.  For two or more offenses.

(a) Committed on occasions different from one another and from the pending charges,

(b) Which are punishable by imprisonment in excess of one year; and

3.  For one or more of the earlier convictions he has been in prison before the commission of the pending criminal act; and

4.  Less than five years have elapsed between commission of the pending felony and either

(a) Defendant's release from imprisonment for one of the earlier convictions, or

(b) Commission of an offense punishable by imprisonment for one year or more.

18 U.S.C., Section 3575(a)(1).

A defendant could also be designated as a Special Offender if the felony of conviction is part of a pattern of criminal conduct which constitutes a substantial source of his income, and "in which he manifested special skill or expertise."  18 U.S.C., Section 3575(a)(2).

If a defendant committed the sentence under conviction in furtherance of a conspiracy with three or more other persons to engage in a pattern of criminal conduct, and the defendant did, or agreed that he would initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or conduct, or

give or receive a bribe or use force as all or part of such conduct, who could

qualify as a Special Offender.  18 U.S.C., Section 3575(a)(3).

"A defendant is dangerous for purposes of Section 3575 when a period of

confinement longer than that provided for such felony is required for the

protection of the public from further criminal conduct by the defendant."  18

U.S.C., Section 3575(f).

Sentences imposed on the Special Dangerous Offender under 18 U.S.C.,

Section 3575 are reviewable on direct appeal pursuant to 18 U.S.C., Section 3576

which provided, in pertinent part:

> With respect to the imposition .  .  .  of a sentence after
> proceedings under Section 3575 .  .  . , a review of the
> sentence on the record of the sentencing court may be
> taken by the defendant or the United States to a Court of
> Appeals .  .  .  .  A review of the sentence shall include
> review whether the procedure employed was lawful, the
> findings made were clearly erroneous, or the sentencing
> court's discretion was abused.  The Court of Appeals on
> review of the sentence may, after considering the record,
> include the entire pre-sentence report, information submitted
> during the trial .  .  .  and the sentencing hearing, in the
> findings and reasons of the sentencing court, affirm the
> sentence, impose or direct the imposition of any sentence
> which the sentencing court could originally have imposed,
> or remand for further sentencing proceedings and imposition
> of sentence, except that a sentence may be made more severe
> only on review of the sentence taken by the United States and
> after hearing.

Prior to the promulgation of the Federal Sentencing Guidelines, there was no other provision of Federal law which provided for appellate review regarding a sentence imposed within statutory limits.  NOLAN did challenge the Court's decision to sentence him as a Special Dangerous Offender on direct appeal, but his claim was rejected.  United States v. Starrett, 55 F.3d 1525, 1532, n. 1 (11th Cir. 1995).

From its inception, the Special Dangerous Offender Statute raised issues regarding the shifting of punishment from the offense to the status of the offender, and raised procedural questions relating to the confrontation of witnesses and proof beyond a reasonable doubt.  United States v. Felder, 706 F.2d 135, 138-9 (3d Cir. 1983).

These issues were in similar fashion addressed in Apprendi v. New Jersey, 540 U.S. 466 (2000), and its progeny.  Apprendi held that sentencing enhancements which increased the maximum penalty allowable by law were elements of the offense and must be proven beyond a reasonable doubt.  The Special Dangerous Offender Statute clearly violated Apprendi.

NOLAN has already sought by way of 28 U.S.C., Section 2255, to challenge the Special Dangerous Offender sentence under Apprendi.  His efforts have been rejected on the grounds that the U.S. Supreme Court never held Apprendi to be

retroactive to cases final before it was handed down.  NOLAN is not, by this Motion, seeking to file a successive petition under Section 2255.

NOLAN is challenging this Court's finding of fact made at the sentencing hearing that the enhanced sentence was necessary to protect the community from him.  NOLAN had presented at his sentencing evidence of his conversion to Christianity which he hoped would persuade the Court that he was well on his way to rehabilitation and would not be a future danger to the community.  The Court chose not to accept his argument back in 1989.  What NOLAN is attempting to present in this Motion is the proof of his sincerity when he made this argument by his action and deeds over a 20-year period.  He has continued and expanded upon his rehabilitation after his sentencing as he had promised.

NOLAN contends that the evidence of his rehabilitation presented in this Motion constitutes a change of circumstance which would make a Writ of Audita Querela appropriate.  Section 2255 was available to address the constitutionality of Section 3575 in light of Apprendi, and it was determined not to be retroactive.  Section 2255 is not, however, applicable to the relief sought herein.   This the sort of "gap" which the case law identified would make relief under audita querela appropriate.  NOLAN's changed circumstances which should prompt the Court to revisit the finding of dangerousness made in 1989.  Pursuant to a Writ of Audita

Querela, the Court can reconsider the factual findings made when it imposed the enhanced sentence under Section 3575.

C. <u>No Parole Recommendation</u>

As previously argued, a Writ of Audita Querela could also be applied to NOLAN's request that the Court rescind its no parole recommendation. But if NOLAN is not correct, he still contends, as set forth above, that no extraordinary writ need be utilized to change a recommendation made at sentencing which did not have the affect of either invalidating the judgment or changing NOLAN's eligibility for parole.

<u>CONCLUSION</u>

Upon the arguments and authorities aforementioned, Defendant requests this Court find that it has the jurisdiction to reconsider its findings of fact in designating him as a Special Dangerous Offender pursuant to 18 U.S.C., Section 3575 and/or rescind his no parole recommendation.   NOLAN is <u>not</u> requesting a reduction in his sentence. If this Court rescinds either or both of the recommendations stated above which have interfered his potential parole release, NOLAN would request a new parole hearing pursuant to 28 C.F.R., Section 2.28, based upon changed circumstance. It would still remain a determination of the

30

Parole Commission whether his release plan meets the guidelines which entitle

him to parole.

     I HEREBY CERTIFY that on May ___, 2010, the foregoing document has been electronically filed with the Clerk of the Court using CM/EMF.

                         Respectfully submitted,

                         CHARLES G. WHITE, P.A.
                         Counsel for Defendant
                         1031 Ives Dairy Road
                         Suite 228
                         Miami, FL 33179
                         Tel: (305) 914-0160
                         Fax: (305) 914-0166
                         E-mail: cgwhitelaw@aim.com
                         Florida Bar No. 334170

                         s/Charles G. White
                         CHARLES G. WHITE, ESQ.